[No. 46647.   En Banc.   October 9, 1980.]

WESLEY D. BUCHANAN, *Respondent*, v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS, ET AL, *Petitioners.*

*Denny Anderson* (of *Vance, Davies, Roberts, Reid & Anderson*) and *William G. Viert* and *James V. Handmacher* (of *Bonneville, Viert, Morton & McGoldrick*), for petitioners.

*Jerome F. McCarthy* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern*), for respondent.

BRACHTENBACH, J.—A labor strike by members of Independent Local 313 in Tacoma (Local), of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers (International) is the source of this lawsuit. Plaintiff, not a union member, drove a delivery truck across the picket lines. He alleges that he was severely beaten by the individual union member defendants. He also sued the Local, the International and the trustee appointed by the International, since the Local was in trusteeship at the time of the incident.

The question is whether the construction of RCW 49.32.070[1] announced in *Titus v. Tacoma Smeltermen's Local 25,* 62 Wn.2d 461, 383 P.2d 504 (1963), should continue as the law in this state. An opposite result was reached 3 years later in *United Mine Workers v. Gibbs,* 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966). The

---

[1]RCW 49.32.070:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the state of Washington for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

United States Supreme Court was construing an identical federal statute.

Feeling bound by the *Titus* decision, the trial court found that there was an issue of material fact and denied the motion for summary judgment submitted by the unions. We affirm the trial court.

If the statute is applicable, it contains two requirements. Liability will attach to the union, its officers and members only upon (1) clear proof of (2) actual participation in, or actual authorization of unlawful acts of individual officers, members or agents, or ratification of such acts after actual knowledge thereof. This would be a substantial variation of the usual rules of vicarious agency liability and proof thereof.

In *Titus v. Tacoma Smeltermen's Union, supra,* we held that RCW 49.32.070, with its high standard of proof and limitation of vicarious liability, did not apply to tort actions of this nature.

Instead the court ruled that the general rules of agency law were applicable. The court said at page 469:

> We agree with the plaintiffs that the general rules of agency law should be applied in this case. It is the general rule that a master may be held liable for the tortious acts of his servant, although he may not know or approve of them, if such acts are done within the scope of the employment . . .

RCW 49.32.070 is part of the "little" Norris–LaGuardia Act, so called since it was patterned after the federal act, 29 U.S.C. §§ 101 *et seq.* Our statute, RCW 49.32.070, is identical to 29 U.S.C. § 106, except for the reference to the courts to which each is applicable.

In *United Mine Workers v. Gibbs, supra,* the court specifically applied section 106 to a claim under state tort law which was brought in federal court. It held that the proof in that case did not meet the special proof requirements of section 106. It traced legislative history, including the subsequent enactment of the Labor Management Relations Act, 29 U.S.C. §§ 141–187 which imposes liability upon

unions and their members under ordinary doctrines of agency rather than the more stringent standards of section 106. It found that the legislature intentionally did not repeal section 106 in view of the court's prior construction of section 106 in *United Bhd. of Carpenters v. United States,* 330 U.S. 395, 91 L. Ed. 973, 67 S. Ct. 775 (1947).

██ To the contrary, in *Titus* our court rejected such a reading of the *Carpenters* case. Rather it looked to the title of RCW 49.32 and read therefrom a legislative intent to limit that act, and therefore 49.32.070, to restraining orders, injunctions, and contempt matters arising out of labor disputes.

Petitioners urge us to overrule *Titus.* It is contended that *Titus* was in error because the language of the statute is not ambiguous and thus examination of the title and interpretation by the court was both unnecessary and improper. *Ayers v. Tacoma,* 6 Wn.2d 545, 557, 108 P.2d 348 (1940).

The question is close, particularly in hindsight, since the *Gibbs* case reached a contrary result.

However, there is one fact which leads us to reaffirm *Titus* and leave the ultimate resolution of this issue to the legislature. That fact is that *Titus* was decided in 1963. Since then the legislature has met in 22 sessions. The legislature is presumed to know the decision in *Titus* and its effect. *State v. Fenter,* 89 Wn.2d 57, 569 P.2d 67 (1977); *Daly v. Chapman,* 85 Wn.2d 780, 539 P.2d 831 (1975). It has never amended the statute.

The legislature, within constitutional constraints, is the body to make the policy decisions on this matter. The failure of the legislature to amend the statute in the 17 years since the *Titus* decision was rendered convinces us that it was and is the policy of the legislature to concur in that result.

We therefore defer to the legislative conclusion of inaction which affirms the result of *Titus,* decline to reexamine it, and remand to the trial court for trial upon the merits consistent with this opinion.

It is so ordered.

ROSELLINI, STAFFORD, HICKS, and WILLIAMS, JJ., and HAMILTON, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—In *United Bhd. of Carpenters v. United States*, 330 U.S. 395, 91 L. Ed. 973, 67 S. Ct. 775 (1947), an indictment was brought for conspiracy under the Sherman Act (15 U.S.C. § 1) involving a group of local manufacturers and dealers in millwork, their incorporated trade associations and officials thereof, and a group of unincorporated trade unions and their officials and business agents. The question before the United States Supreme Court was whether section 6 of the Norris–LaGuardia Act, 47 Stat. 70–71 (1932), limited the power of the trial court in trying the case. After holding that the limitations of the section applied to all federal courts in matters growing out of labor disputes, the court explored the legislative history of the section and determined that it was intended

> to relieve organizations, whether of labor or capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration.

(Footnotes omitted.) 330 U.S. at 403.

The court continued:

> Thus § 6 limited responsibility for acts of a co-conspirator—a matter of moment to the advocates of the bill. Before the enactment of § 6, when a conspiracy between labor unions and their members, prohibited under the Sherman Act, was established, a widely publicized case had held both the unions and their members liable for all overt acts of their co-conspirators. This liability resulted whether the members or the unions approved of the acts or not or whether or not the acts were offenses under the criminal law. While of course participants in a conspiracy that is covered by § 6 are not

immunized from responsibility for authorized acts in furtherance of such a conspiracy, they now are protected against liability for unauthorized illegal acts of other participants in the conspiracy.

(Footnotes omitted.) 330 U.S. at 404. This paragraph and the further discussion which the court pursued concerning the legislative history reflect the court's view that the section was enacted to forestall judicial discouragement of legitimate union activity through application of rules of conspiracy liability. The focus was indeed upon removing unjust judicial obstacles to labor organization and union activities. The court observed that proponents of the section had argued that it was not its purpose to affect the law of agency in civil matters. This court, when it decided *Titus v. Tacoma Smeltermen's Local 25,* 62 Wn.2d 461, 383 P.2d 504 (1963), was not unjustified in concluding from the language of *United Bhd. of Carpenters v. United States, supra,* that the United States Supreme Court had found the thrust of the federal provision to be aimed at criminal prosecutions, rather than at damage suits by persons who have suffered physical injuries at the hands of overzealous picketers.

While the same court, in the later case of *United Mine Workers v. Gibbs,* 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966), extended the holding of the *United Brotherhood* case to cover a civil conspiracy action, it did so without discussion of the intended scope of section 6 of the federal act. The wrong complained of there was, like that in *United Brotherhood,* economic harm resulting from union activities. In neither case was the court called upon to decide whether the section was meant to restrict recovery in cases of physical assault. I see no reason to assume that it would reach that conclusion were such a case before it. Certainly, in a case such as this, where the evidence before the court shows grave bodily injury inflicted upon the plaintiff by a band of pickets and direct evidence that the international union's representative encouraged and condoned that conduct, it is difficult to conceive that the

United States Supreme Court would find it within the congressional intent to deny to the plaintiff his common law right of recovery.

It may be that our interpretation of RCW 49.32.070 in *Titus* was too narrow. But if that construction is to be revised, I would wait until a case arises in which it is apparent that the result which it produces was not intended by the legislature. I can find in our statutes no indication that the legislature ever intended to encourage violence in union activities, and the construction urged by the petitioner, as well as the dissent, would do just that. Since our decision in *Titus,* labor relations in this state have been conducted successfully without the need for resort to such tactics, and I believe we can trust the legislature to have taken note of that fact. It is evidence that the construction adopted in that case has not aroused sufficient public dissatisfaction to inspire the legislature to correct that interpretation, if indeed it was in error. Seventeen years of acquiescence convinces me that the legislature has found that this court's interpretation, though perhaps not adhering to the exact letter of the enactment, gives effect to its spirit and serves the legislative purpose.

Accordingly, I concur in affirmance of the trial court's order denying the defendant's motion for summary judgment.

HICKS and WILLIAMS, JJ., and HAMILTON, J. Pro Tem., concur with ROSELLINI, J.

HOROWITZ, J. (dissenting)—I must dissent from the majority's decision that the plaintiff's tort action against defendant union organizations and officials could not be precluded by application of RCW 49.32.070. RCW 49.32.070 requires "clear proof" of actual participation in, authorization, or ratification of acts before liability for actions taken in labor disputes can be assessed against unions, union officials, or union members. We should follow the United States Supreme Court's decision in *United Mine Workers*

*v. Gibbs,* 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966), that the federal statute from which RCW 49.32.070 was taken precludes civil tort actions based on common law agency grounds and therefore rule that the case be remanded to determine if the plaintiff's tort suit should be dismissed under the provisions of RCW 49.32.070.

The majority relies on *Titus v. Tacoma Smeltermen's Local 25,* 62 Wn.2d 461, 383 P.2d 504 (1963), in which this court held that RCW 49.32.070 does not prevent tort suits based on agency principles against unions and union officials. The *Titus* court cited the title to the act containing RCW 49.32.070, RCW 49.32, which states that the act limits "the powers of the courts of this state in the granting of restraining orders and injunctions . . . and in the trial and punishment for contempt for violation thereof". Laws of 1933, 1st Ex. Sess., ch. 7. The *Titus* court concluded that "the only logical conclusion" that could be drawn from the title "is that [RCW 49.32.070] is a limitation on the courts of this state in cases involving labor restraining orders and injunctions only and does not extend itself to the area of tort liability." *Titus v. Tacoma Smeltermen's Local 25, supra* at 468. The majority's reliance on *Titus* is, however, clearly misplaced after *Gibbs.*

In *Gibbs,* the Supreme Court demonstrated the inappropriateness of the decision in *Titus.* In refusing to allow tort suits in labor disputes without clear proof of participation, authorization or ratification, the *Gibbs* court relied on the legislative history of the federal act that provided the model for our state. This history was extensively examined in *United Bhd. of Carpenters v. United States,* 330 U.S. 395, 91 L. Ed. 973, 67 S. Ct. 775 (1947), which the *Gibbs* court relied on in its decision. The Supreme Court in *United Brotherhood* concluded that the purpose of the provision was to "relieve organizations . . . and members of those organizations from liability for damages or imputation of guilt for lawless acts . . . without clear proof". (Footnote omitted.) *United Bhd. of Carpenters v. United States, supra* at 403. On this basis, the *Gibbs* court ruled

that the federal provision on which RCW 49.32.070 was modeled prohibited tort suits without clear proof of culpable activity on the part of union defendants.

*Gibbs* clearly should be followed in this case. The labor law provisions of RCW 49.32, including RCW 49.32.070, are identical to the federal statutes from which they were taken. Our task is to interpret and apply the legislative enactment, not to speculate upon the legislature's wisdom in enacting the statute, *State v. Bryan,* 93 Wn.2d 177, 180, 606 P.2d 1228 (1980). The precedential value of federal interpretations of these provisions is clearly established and the court should acknowledge the error in *Titus* after *Gibbs. See State v. Carroll,* 81 Wn.2d 95, 109, 500 P.2d 115 (1972) ("It is the rule that a statute adopted from another jurisdiction will carry the construction placed upon such statute by the other jurisdiction."); *see American Radio Ass'n v. Superior Court,* 237 Cal. App. 2d 891, 47 Cal. Rptr. 419, 423 (1965). "An act should be so construed as to make uniform the law of those states which have enacted similar legislation." 82 C.J.S. *Statutes* § 373(a), at 866–67 (1953). *See* 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 5201 (4th ed. 1972). This is particularly true when the state statute is "borrowed" from a federal source:

> Where a legislature adopts a federal statute verbatim, the history of the law and the intent of congress when it adopted the provision have a bearing on the intent of the legislature, and it may be presumed that the legislature knew of the interpretation placed on the provision as expressed during the debates when before congress for adoption, had the same objectives in mind, and employed the statutory terms in the same sense.

(Footnotes omitted.) 82 C.J.S. *Statutes* § 371, at 859 (1953). *Juanita Bay Valley Community Ass'n v. Kirkland,* 9 Wn. App. 59, 68–69, 510 P.2d 1140 (1973) ("[W]hen a state borrows federal legislation it also borrows the construction placed upon such legislation by the federal courts."). *Gibbs* and *United Brotherhood* demonstrate the legislative intent to preclude tort actions in labor disputes

without clear proof of participation, authorization, or ratification, and they should compel adherence in this case.

The majority's failure to acknowledge *Gibbs'* precedent is particularly indefensible in light of the initial faulty reasoning of *Titus.* As was demonstrated by *Gibbs'* reliance on *United Brotherhood,* in *Titus* this court erred in refusing to follow the analysis of *United Brotherhood.* Although it is true, as noted in the *Titus* opinion, that *United Brotherhood* involved a criminal prosecution, the question addressed in *United Brotherhood* was the very one raised by *Titus* and by the instant case—whether clear proof of participation, authorization, or ratification is necessary to assess liability for acts undertaken in labor disputes. The *Titus* court erred in its dismissal of *United Brotherhood* on the grounds of its criminal nature, for the legislative history analysis undertaken was equally relevant to civil and criminal suits. *See United Mine Workers v. Gibbs, supra* at 736–37.

In addition, the *Titus* court's reliance on the title of the act codified as RCW 49.32 is misplaced. The title of a bill is not intended as an index to its contents; all details of an enactment cannot be gleaned from its title and thus it is of little use in limiting the scope of a particular provision. *Treffry v. Taylor,* 67 Wn.2d 487, 491, 408 P.2d 269 (1965). Particularly in this case, when the examined provision is only a portion of the bill that carries the title, great care must be taken in placing any reliance on the general heading of the enactment. *See Spokane v. State,* 198 Wash. 682, 690, 89 P.2d 826 (1939) ("[T]he scope and intent of a statute is not controlled by the name given to it by way of designation or description."). In carrying out the legislature's intent, the court should instead have relied on the language of the particular provision considered and on the legislative history of its federal enactment, as set forth in *United Brotherhood.*

Finally, the majority does not claim that *Titus* correctly construed RCW 49.32.070. Indeed, the majority's only argument for its continued adherence to *Titus* is that the

legislature has had ample opportunity to change *Titus'* interpretation and has not done so. This argument is unpersuasive.

Both cases cited by the majority in support of the proposition that legislative inaction is probative of acquiescence in an earlier judicial interpretation are inapplicable. *State v. Fenter,* 89 Wn.2d 57, 569 P.2d 67 (1977) and *Daly v. Chapman,* 85 Wn.2d 780, 539 P.2d 831 (1975) involved statutes passed *after* judicial interpretation of earlier related enactments. The legislature could thus have been presumed to have taken notice of the related statutes and judicial interpretations thereof. That is not the case here, where the legislature has done nothing with regard to RCW 49.32.070 and nothing has called the rule of *Titus* to its attention. Nothing can be inferred from the legislature's failure to act with regard to RCW 49.32.070; legislatures express intent by enacting statutes, not by remaining silent. The majority's presumption is that the legislature is aware of its past enactments, and judicial interpretations thereof. Although there are occasions when that presumption is rightfully used as, for example, when we consider a statute later enacted, its significance is substantially diminished when there is no evidence that the past enactments and interpretations have been brought to the legislature's attention. Even in cases where amendatory bills have been considered and rejected by the legislature, the courts have been reluctant to rely on legislative inaction and silence in light of a later interpretation of a statute. *United States v. Wise,* 370 U.S. 405, 411, 8 L. Ed. 2d 590, 82 S. Ct. 1354 (1962). The reenactment of a statute after judicial interpretation has also been insufficient to constitute legislative acquiescence in the earlier construction. "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard v. United States,* 328 U.S. 61, 69, 90 L. Ed. 1084, 66 S. Ct. 826 (1946).

There is no evidence in this case that this court's interpretation of RCW 49.32.070 in *Titus* was ever expressly considered by the legislature. Rather than presuming

acquiescence in an erroneous interpretation because of the legislature's silence, it would be as logical to conclude that no action was taken because the legislators presumed that the Supreme Court's decision 3 years later in *Gibbs* insured that RCW 49.32.070 would be properly interpreted to preclude tort suits of the type brought in this case without clear proof of participation, authorization or ratification. If we are to presume that the legislature knew of *Titus,* even though the case was not brought to its attention, it would be reasonable to presume that it knew of *Gibbs* and that the legislature assumed that this court would follow the general rule that the judicial interpretations of a statute borrowed from another jurisdiction would be followed in interpreting RCW 49.32.070. 82 C.J.S. *Statutes* §§ 371, 373(a); 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 52.02 (1972).

In sum, the majority's reliance on legislative silence is unjustified:

> Suppose the legislature refrains from amending a statute an uncertainty in which the courts of the jurisdiction have previously resolved. Would this constitute effective legislative approval of the judicial interpretation? The question becomes relevant whenever a court determines that it would be desirable to change the earlier interpretation. . . .
>
> The first question is whether legislative silence can constitute effective legislative action. It seems obvious that a legislature cannot legislate effectively by not legislating at all. . . .
>
> The second question is whether legislative silence has a probative value for inferring current legislative intentions. The answer to this also seems clear. In the realities of the legislative process, almost no reliable inference of current intent could be drawn. In many cases the legislature is unaware of the relevant court decision. Even where it is fully aware of it, there are often reasons other than approval why a legislature remains silent or inactive.
>
> Alternatively, there may be no reason beyond the fact that the legislature is busy with what it considers more important public matters, or that the legislature does not

consider the matter important enough to engage the attention of the whole legislative process. Certainly, the Supreme Court's interpretation of the Mann Act in *Caminetti v. United States* [242 U.S. 470, 61 L. Ed. 442, 37 S. Ct. 192 (1916)] was considered a perversion of congressional intent, and yet political considerations intervened to head off corrective legislation. There could hardly be less reputable legislative material than legislative silence.

(Footnotes omitted.) R. Dickerson, *The Interpretation and Application of Statutes* 181–82 (1975).

This court should not attempt to avoid its interpretative duties by relying on the legislature's inaction in light of a decision, *Titus,* which is now revealed to be clearly erroneous by *Gibbs.* Reconsideration of the provisions of RCW 49.32.070 in light of the Supreme Court's decision in *Gibbs* should require us to reverse the trial court's denial of the defendant's motion for summary judgment and remand the case for decision under the standards of RCW 49.32.070.

I therefore dissent.

UTTER, C.J., and DOLLIVER, J., concur with HOROWITZ, J.